# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

GURSHARAN SINGH,            )
                            )
               Plaintiff,     )
                            )
             v.          )   Case No. 1:23-cv-00975-TWP-MKK
                            )
COMMUNITY HEALTH NETWORK,  )
RACHEL SHOCKLEY,        )
KATHLEEN ZOPPI,        )
COMMUNITY HOSPITAL     )
SOUTH/COMMUNITY SOUTH OSTEOPATHIC )
FAMILY MEDICINE RESIDENCY,  )
                            )
              Defendants.   )

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Community Health Network, Rachel Shockley ("Dr. Shockley"), Kathleen Zoppi ("Dr. Zoppi"), and Community Hospital South/Community South Osteopathic Family Medicine Residency (the "Residency Program") (collectively, "Defendants") ([Filing No. 25]). *Pro se* Plaintiff Gursharan Singh ("Dr. Singh") initiated this action after he was terminated from the Residency Program, asserting claims under Title VII of the Civil Rights Act ("Title VII") and the Americans with Disabilities Act ("ADA"). Dr. Singh alleges the Defendants discriminated against him because of his national origin, religion as Sikh Indian, and disability.  The Defendants have moved for summary judgment on each of Dr. Singh's claims.  For the reasons explained below, the Defendants' Motion is **granted**.

## I.      BACKGROUND

The facts stated below are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, they are presented in the light most favorable to Dr. Singh as the non-

moving party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.    **The Parties**

Dr. Singh is a Sikh American born in India.  (Filing No. 2 at 2.)  He completed Medical School at NYIT College of Osteopathic Medicine in May 2021, and was employed as a Resident Physician at Community South Osteopathic Family Residency/Community Health Network starting on July 1, 2021.  *Id.*

Community Health Network is an Indiana non-profit health system with multiple sites of care and affiliates throughout Indiana (Filing No. 25-2 ¶ 3).  Community Health Network operates the Residency Program, a three-year osteopathic postdoctoral residency program for physicians who have completed medical school but wish to obtain advanced skills and licensing in family medicine practice. *Id.* The Residency Program is accredited by the Accreditation Council for Graduate Medical Education ("ACGME").  In March 2021, Dr. Singh was selected to participate in the Residency Program as a first-year resident for the 2021-2022 academic year.  *Id.* ¶ 4.  Dr. Singh's employment began July 2021.  *Id.*

Since 2018, Dr. Shockley has served as the program director of the Residency Program. *Id.* ¶ 2. As program director, Dr. Shockley is responsible for recruiting efforts including interviewing every applicant and selecting which applicants match into the Residency Program. *Id.* ¶ 5.  She is also responsible for oversight of the Residency Program's budgeting, daily clinical and educational operations, and long-term policy administration.  *Id.*

At the relevant time period, Dr. Zoppi was Community Health Network's Chief Academic Officer and Designated Institutional Officer ("DIO"), but she no longer holds those positions.  (*See* Filing No. 12 at 3.)  In this role, Dr. Zoppi was responsible for overseeing all graduate medical

education programs operated by Community Health Network, including the Residency Program. (Filing No. 25-2 at ¶ 8.)  As Program Director, Dr. Shockley reported to Dr. Zoppi. *Id.*

The Residency Program's core faculty consists of the program director, physician faculty, behavioral faculty, a residency coordinator, a clinical pharmacist, a part-time nutritionist, and a practice manager.  *Id.* ¶ 6.  These positions serve on a Clinical Competency Committee ("CCC") that is responsible for evaluating resident performance based upon competencies developed by the ACGME, and assessing whether a resident is capable of promotion to the next postgraduate year and ultimately graduation from the Residency Program.  *Id.*  During Dr. Singh's tenure, members on the CCC included: Dr. Shockley; Dr. Eugene Justus ("Dr. Justus") (physician faculty and Dr. Singh's faculty advisor); Dr. Holly Wheeler; Dr. Jacklyn Kiefer; Dr. Courtney McNeill (physician faculty); Dr. Brittany Simpson; Dr. Anne Packard; Kim Jones, LCSW (behavioral faculty); Tina Burch, RN; Kyle Sparks; Julie Stinger; and Kaitlyn Wong.  *Id.* ¶ 7.

In addition to working with the CCC, junior residents also work with Chief Residents. Chief Residents are third-year residents who take on additional responsibilities within the Residency Program including administrative responsibilities, resident leadership roles, and mentorship and supervision over junior residents.  *Id.* ¶ 11.  Although Chief Residents may help train and evaluate junior residents, Chief Residents do not have any authority to discipline, terminate, or promote residents, and they are not members of the CCC.  *Id.*  During Dr. Singh's tenure, Dr. Courtney Clawson ("Dr. Clawson") and Dr. Kyle Morlan served as Chief Residents. *Id.*

### B.    The Policies

After being accepted into the Residency Program, residents must sign an employment agreement that is subject to the policies and procedures set forth in the Residency Program's Graduate Medical Education Handbook (the "GME Handbook") (Filing No. 25-3 at 2-16).  The

GME Handbook contains a Resident Promotion, Evaluation and Contract Renewal policy ("Promotion Policy") that outlines the requirements a resident must meet to advance from one year of residency to the next (Filing No. 25-4 at 6-9). The GME Handbook also discusses procedures for concerns, performance problems, and offenses. *Id.* at 9. Residents must acknowledge they read and understand the GME Handbook and agree to comply with all policies, procedures, and obligations contained therein (Filing No. 25-3 at 2-3). Dr. Singh signed the GME Handbook's Program Agreement effective June 21, 2021, for the 2021-2022 academic year. *Id.* at 12.

### 1.    Evaluations

Throughout the academic year, residents rotate between specialty blocks for one-month periods focusing on different medical specialties (Filing No. 25-2 ¶ 9). During these rotations, residents work under the supervision of Residency Program faculty, Community Health Network employed physicians, and/or private practice physicians. *Id.* These individuals are commonly called preceptors. *Id.* A resident may work with multiple different preceptors during any single rotation which may change from day-to-day and clinic-to-clinic. *Id.*

Generally, residents receive a rotation evaluation from a preceptor for each rotation. *Id.* ¶ 12. Preceptors evaluate residents on a scale of Level 1 to 5, with Level 5 being the highest, based upon the expected level of competency at the resident's level of training. *Id.*; *see e.g.,* Filing No. 25-3 at 17-162. Preceptors also report a pass/fail grade for each rotation (Filing No. 25-2 ¶ 12).

Residents receive additional evaluations throughout the year, including: (1) Semiannual Advisor Milestone Evaluations ("Advisor Evaluations"); (2) Mid-Year CCC Resident Milestone Evaluations ("Mid-Year Evaluations"); and (3) Year-End CCC Resident Milestone Evaluations ("Year-End Evaluations"). *Id.* ¶ 13. The Advisor Evaluations are conducted by the resident's faculty advisor and assess the advisor's overall impressions of the resident's performance. *Id.* ¶ 14. The Mid-Year Evaluations and Year-End Evaluations are conducted by the CCC at the mid-

point and end of the academic year, respectively, and evaluate the attainment of milestones associated with clinical and professional competencies. *Id.* ¶ 15. Evaluation of the resident's developmental progress is based on rotation evaluations, informal feedback from preceptors, and overall judgment of the resident's performance by the CCC. *Id.*

Competencies measured in the Mid-Year Evaluations and Year-End Evaluations include Patient Care, Medical Knowledge, Systems-Based Practice (including patient safety), Practice-Based Learning & Improvement, Professionalism, and Interpersonal and Communications Skills (collectively, the "core competencies"). *Id.* ¶ 16. These core competencies are developed by ACGME. *Id.* Like rotation evaluations, residents are rated on a scale of Level 1 to 5, with Level 5 being the highest, including half levels (*e.g*, Level 1.5 or 2.5). *Id.* Residents may also receive a score of "Not Yet Completed Level 1." *Id.* The Residency Program expects first-year residents, like Dr. Dr. Singh, to average a score of Level 1.5 or 2 on the Mid-Year Evaluation and a score of Level 2 to 2.5 on the Year-End Evaluation. *Id.* ¶ 17.

### 2. <u>Promotion, Suspension, and Termination</u>

As Program Director, Dr. Shockley is the ultimate decision-maker with respect to resident promotion and termination ([Filing No. 25-4 at 9](#)). Residents who need improvement in one or more ACGME core competencies may be placed on a Performance Improvement Plan ("PIP"). *Id.* at 11. A PIP is not a corrective action or formal disciplinary action; rather, a PIP is an educational tool to correct areas of unsatisfactory performance. *Id*. Accordingly, residents may not appeal a PIP. *Id*. Residents placed on a PIP receive a document outlining deficiencies and plans for improvement and must periodically meet with Residency Program leadership to assess the resident's progress. *Id*. Residents may also be required to participate in an external mental and/or physical assessment and/or treatment in conjunction with a PIP ([Filing No. 25-2](#) ¶ 19). Continued

unsatisfactory performance on a PIP may result in a continuation of the PIP, probation, suspension, non-promotion, or termination (Filing No. 25-4 at 12).

Residents are placed on probation when there are serious identified areas of unsatisfactory performance that require immediate remediation and/or improvement. *Id.* at 14. If the resident's performance deficiencies are not resolved during the probation period, the resident may be terminated by the DIO on the written recommendation of the Program Director and in consultation with Human Resources. *Id.* at 14-15. Residents who are terminated or not promoted may appeal the Program Director's decision within five business days. *Id.* at 18-19. A committee of physicians who are independent of the Residency Program will review the appeal and issue a recommendation to affirm or reverse the Residency Program's decision. *Id.*

C.   **Dr. Singh's Performance**

Dr. Singh began his residency in July 2021 and completed the Family Practice Essentials rotation (Filing No. 28-3 at 12). This rotation focused on administrative tasks, recordkeeping systems, and other practice related skills – there was limited patient interaction (Filing No. 31-1 ¶ 3). Dr. Singh performed well during this rotation and got excellent feedback and evaluation from Dr. Shockley for his Family Practice Essentials rotation (*see generally* Filing No. 28-3).

In August 2021, Dr. Singh completed his first patient-focused rotation in the Intensive Care Unit and exhibited some performance deficiencies (Filing No. 25-3 at 17-19). Dr. Faheem Abbasi ("Dr. Abbasi") noted in Dr. Singh's evaluation that he needed to "read and study a lot" and "work extremely hard" because "his fund of knowledge and learning and his presentations [left] much to be desired." *Id.* at 19. Dr. Abbasi further rated Dr. Singh a Level 2 out of 5 in Diagnostic Judgment (Patient Care); Appropriateness of Treatment Plan (Patient Care); and Quality of Case Presentations (Interpersonal and Communication Skills) – indicating Dr. Singh should be recommended for remediation in these areas. *Id.* at 17-18. Despite these concerns, acknowledging

6

that this was Dr. Singh's first rotation and that Dr. Singh "should be given scope for improvement and time," Dr. Abbasi gave Dr. Singh a passing score on the rotation. *Id.* at 19.

In September 2021, Dr. Benjamin Abratigue ("Dr. Abratigue") opined that Dr. Singh had similar performance deficiencies during his Inpatient Medicine rotation. *Id.* at 20-25. Dr. Abratigue noted that upper-level residents "had to help [Dr. Singh] significantly with preparation and presenting at rounds." *Id.* at 22. He also noted that Dr. Singh had not successfully completed the rotation. *Id.* However, Dr. Shockley, who also worked with Dr. Singh on this rotation, marked that Dr. Singh had satisfactorily completed the rotation. *Id.* at 25. Still, Dr. Shockley noted "strong concerns about [Dr. Singh's] application of clinic knowledge" and stated Dr. Singh had "significant challenges ahead to catch up to the expected level." *Id.*

In October 2021, Dr. Justus completed an Advisor Evaluation on Dr. Singh. *See id.* at 26. Dr. Singh received a Level 1 in 16 out of 19 subcategories of the core competencies based on his performance from July 2021 to October 2021. *Id.* at 26-34. Dr. Singh received a Level 1.5 in the remaining three subcategories. *See id.*

### 1. **Dr. Singh is Placed on a PIP**

In November 2021, based on Dr. Singh's poor performance related to his medical knowledge, presentation skills, patient care, and clinical application, the Residency Program placed Dr. Singh on a PIP. *Id.* at 43-49. The PIP outlined Dr. Singh's performance issues and set specific goals, milestones, and timelines for improvement. *See id.* As a condition of his PIP, Dr. Singh was to undergo an evaluation by the Indiana State Medical Association ("ISMA") to further ascertain if there were "other physical and mental barriers to his educational plan." *Id.* at 48. Dr. Singh signed the PIP on December 20, 2021, and understood that continued unsatisfactory performance could result in a continuation the PIP or disciplinary action (*id.*; Filing No. 25-5 at 29 [76:13-18]). Dr. Singh does not recall disagreeing with anything in the PIP. *Id.* at 51.

7

On December 22, 2021, the Residency Program formally instructed Dr. Singh to schedule an appointment with the ISMA to identify an external agency for "an evaluation of [Dr. Singh's] medical and professional performance" which would require him to agree to the evaluation, monitoring, and possible follow-up medical or therapeutic treatment to improve his performance (Filing No. 25-3 at 53). The Residency Program further noted Dr. Singh would be placed on paid administrative leave of absence during the assessment period. *Id.* at 54. Dr. Singh was not sent for the evaluation until the first week of February 2022 "despite repeated requests by him to Dr. Shockley for getting the evaluation sooner as it was causing significant mental stress" upon Dr. Singh. (Filing No. 27 at 2.)

After consulting with the ISMA, Dr. Singh participated in an external assessment at the Professional Renewal Center ("PRC") in Lawrence, Kansas (Filing No. 23-5 at 107 [210:9-13]). PRC diagnosed Dr. Singh with depression, anxiety, and post-traumatic stress disorder ("PTSD"). *Id.* PRC recommended that Dr. Singh continue to participate "in an intensive and integrative treatment process that includes a therapeutic process for trauma recovery and skill enhancements." (Filing No. 25-3 at 65.) On February 18, 2022, Dr. Shockley sent a letter to Dr. Singh outlining PRC's recommendations and Dr. Singh was informed that he had to comply with the recommendations otherwise his employment would be terminated. Dr. Singh was referred to a treatment program that could provide "psychiatric oversight and be able to address issues related to trauma recovery skills, anxiety management, depression management skills, and generally enhance his capacity for distress tolerance." *Id.* Dr. Singh was not given any other option for the treatment of his anxiety, depression, and PTSD, and was given the ultimatum to either go to PRC for the expensive therapy or face termination. (Filing No. 27 at 4.)

Dr. Singh made efforts to improve himself by watching the other first year residents as they did their presentations and he believed that he was doing well and progressing. (Filing No. 25-5 at 63). But in May 2022, a second-year resident, Dr. Taylor Bachert ("Dr. Bachert"), reported that Dr. Singh caused a patient safety event when he started performing a procedure on a patient without supervision during his Adult In-Patient rotation (Filing No. 25-3 at 155). On May 28, 2022, Dr. Bachert was working with Dr. Singh under the supervision of Dr. Ashish Patel. *Id.* During this shift, Dr. Haris Siraj ("Dr. Siraj"), another preceptor, asked Dr. Singh and Dr. Bachert if they would like to assist with a procedure, and they agreed. *Id.* Once in the patient's room, Dr. Bachert realized they had the wrong supplies and left to gather the proper supplies. *Id.* Dr. Singh injected the patient with lidocaine and picked up the tool that would be used to puncture the patient and used the tool to test the patient's sensitivity for feeling pain. (Filing No. 25-5 at 81-85). When Dr. Bachert returned, she observed Dr. Singh beginning to perform the procedure by puncturing the patient's skin with a scalpel. *Id.* During this time, Dr. Siraj was outside the patient room taking a patient admission over the telephone. *Id.* Dr. Singh had not received permission to begin the procedure unsupervised. *Id.*

During the time of the incident, Dr. Shockley was on leave but when she returned she initiated an investigation into the serious patient safety concerns (Filing No. 25-2 ¶ 23). Dr. Shockley spoke with both Dr. Bachert and Dr. Siraj who confirmed Dr. Singh punctured a patient's skin with a scalpel and without direct supervision. *Id.* On June 9, 2022, Dr. Singh was suspended effective immediately for performing a procedure as a first-year resident without direct supervision – a Residency Program policy violation and patient safety concern (*see* Filing No. 25-3 at 149).

On June 13, 2022, Dr. Singh sent an email to Dr. Siraj conveying his version of the patient safety event in hopes of "a fair decision on [his] suspension." (Filing No. 25-3 at 154.) Dr. Singh

9

was under the impression that he was to perform a paracentesis procedure under the supervision of Dr. Siraj. *Id.* Dr. Singh began the procedure by using the scalpel to "check the sensitivity." (Filing No. 25-5 at 88-89 [158:14-159:7]). He "was in the process of making a skin cut when Dr. Bachert asked [him] to stop" because Dr. Siraj had just left the room (Filing No. 25-3 at 154). Following Dr. Bachert's direction, Dr. Singh halted the procedure "before even beginning it." *Id.* Dr. Singh was unaware that Dr. Siraj had left because his back was turned toward him (Filing No. 25-5 at 82-83 [154:24-155:15]).

### 2. Dr. Singh's Evaluation Post-PIP

On June 12, 2022, Dr. Justus completed an Advisor Evaluation (Filing No. 25-3 at 81). Dr. Justus opined that Dr. Singh "[was] not ready to advance to the next level of training (2nd year status)" and that Dr. Singh's "application of [] knowledge [was] a significant issue." *Id.* Out of the 26 subcategories of the core competencies, Dr. Justus rated Dr. Singh at "Not Yet Level 1" in 14 subcategories and Level 1 in 12 subcategories based on Dr. Singh's performance through his first year of residency. *Id.* at 81-94.

On or around June 14, 2022, the CCC met to conduct Dr. Singh's Year-End Evaluation and to review Dr. Singh's performance, progress on the PIP, and recent patient safety concerns to assess his eligibility for promotion and/or continuation in the Residency Program (Filing No. 25-2 ¶ 25). Dr. Singh received fairly poor performance evaluations (*see generally* Filing No. 25-3 at 95-148). The CCC expects first-year students to average of Level 2 to 2.5 on the Year-End Evaluation (Filing No. 25-2 ¶ 17). Dr. Singh's score primarily ranged between Level 0 and Level 1 (Filing No. 25-3 at 95-148). A sampling of Dr. Singh's averages compared to his peers shows that on average he scored a 0.1 when his peers scored a 2.23. *Id.* at 95, 97, 107, 109, 123.

### 3.    Dr. Singh is Removed from the Residency Program

Citing to Dr. Singh's performance and patient safety concerns, the CCC unanimously decided Dr. Singh could not be promoted to a second-year resident or continue in the Residency Program (Filing No. 25-2 ¶ 26).  On June 16, 2022, Dr. Shockley sent Dr. Singh a letter informing him that the Residency Program would not renew his employment contract for the upcoming academic year and Dr. Singh would be removed from the Residency Program (Filing No. 25-3 at 150-51).  On June 22, 2022, Dr. Singh appealed the Residency Program's determination.  *Id.* at 152-53.  On July 25, 2022, an independent review committee affirmed the Residency Program's decision "citing multiple data points which indicated non-progression toward expected developmental clinical performance milestones during training."  *Id.* at 157.

## II.    LEGAL STANDARD

### A. *Pro se* Pleadings

Dr. Singh is proceeding *pro se*.  "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  The mandated liberal construction afforded to *pro se* pleadings:

> means that if the court can reasonably read the pleadings to state a valid claim on which the [plaintiff] could prevail, it should do so despite the [plaintiff's] failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements.

*Harpel v. Ulrick*, Case No. 1:18-CV-320, 2020 WL 584615, at *1 (N.D. Ind. Feb. 6, 2020) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)).  On the other hand, "a district court should not 'assume the role of advocate for the *pro se* litigant' and may 'not rewrite a petition to include claims that were never presented.'"  *Id.*  Moreover, although *pro se* filings are construed liberally, *pro se* litigants are not exempt from procedural rules.  *See Pearle Vision, Inc. v. Romm*, 541 F.3d

751, 758 (7th Cir. 2008) (noting that "*pro se* litigants are not excused from compliance with procedural rules"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced"). At the same time, the Seventh Circuit has also explained that local rules—and instructions on how to comply with them—are "not intended to provide a maze of technical traps to complicate and delay litigation without advancing the merits." *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) (district court did not abuse discretion by overlooking moving parties' technical failures to comply with local rule on summary judgment materials).

**B.    Summary Judgment Standard**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (7th Cir. 2009) (citation omitted).  "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).

"The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (internal citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.    DISCUSSION

Dr. Singh asserts that Defendants terminated his employment because of his religion, national origin, and disability status.  He argues the delay in his evaluation clearly shows lack of seriousness on the part of the Defendants about monitoring his performance and is clear evidence that the Program was not concerned about his performance; rather, these rotations and the PIP were tools to harass him.  He asserts that Defendants violated Title VII by failing to promote him, retaliating against him, subjecting him to a hostile work environment, and terminating his employment. Dr. Singh also asserts that Defendants violated the ADA by failing to accommodate him and terminating his employment. In reply, Defendants' dispute each of Dr. Singh's assertions.

In his response, Dr. Singh concedes that Dr. Shockley and Dr. Zoppi are immune from individual liability (Filing No. 27 at 8). Therefore, all claims against Dr. Shockley and Dr. Zoppi are **dismissed**. The Court will discuss the claims against Community Health Network and the Residency Program (collectively, "Community") after discussing their admissibility arguments.

## A. **Evidentiary Matters**

As a preliminary matter, in their Reply (Filing No. 30), Defendants generally object to Dr. Singh's "statement of material facts in dispute," arguing that "[r]eviewing each instance of inadmissible evidence offered by [Dr. Singh]" would be "a painstakingly arduous exercise." (*See* Filing No. 30 at 4.)  The Court finds Defendants' general objections waived because they have not sufficiently explained any basis for them.  *See* Fed. R. Evid. 103(a)(1)(B) (requiring that an objecting party "state[] the specific ground" for an objection); *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1149-50 (7th Cir. 1989) (rules of evidence apply on summary judgment).

Defendants do address a sampling of Dr. Singh's evidence which the Court will discuss briefly.  First, Defendants argue that Dr. Singh's allegations that they purposefully withheld his October, November, and December 2021 evaluations are inadmissible because he provided no affidavits, deposition testimony, or admissible documents to support his assertion. Second, Defendants argue Dr. Singh's call with Dr. Siraj, where he states the patient safety event was false and "did not happen" (Filing No. 28-47) is inadmissible hearsay. Lastly, Defendants argue Dr. Singh's performance evaluations from his new residency program at St. John's Episcopal Hospital (Filing No. 27 at 9) are inadmissible because were not submitted during discovery.

It is well established that *pro se* litigants are not excused from compliance with procedural rules, including the local rules and rules of evidence.  *See Lobster v. United States*, 606 F. Supp. 2d 897, 909 (N.D. Ind. 2009).  Dr. Singh's arguments as they relate to his October, November, and December 2021 evaluations are excluded as they are not supported by facts.  *See* S.D. L.R. 56-1(e).  Similarly, the recording of the telephone call with Dr. Siraj and the performance evaluations from St. John's are excluded as inadmissible hearsay and will not be considered.  *See Anderson v. City of Rockford*, 932 F.3d 494, 509 (7th Cir. 2019) (holding that recorded calls could not be used as evidence in opposition to summary judgment "because they contain inadmissible hearsay."); *see*

14

*also Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment). The Court will consider Dr. Singh's deposition testimony concerning the events and because he is proceeding *pro se*, where appropriate, will excuse his technical failures to comply with the local rule on summary judgment materials.

**B.    National Origin and Religious Discrimination Claims**

Title VII prohibits employers from discriminating against their employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). A plaintiff may prove discrimination by using either the direct method or the indirect, burden shifting method. *Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000). But regardless of how one chooses to proceed, at summary judgment, courts ask whether the evidence "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). This evidence must be considered as a whole instead of asking whether any piece of evidence proves the claim by itself. *Id.*

**1.    Direct Method**

Under the direct method, a plaintiff must offer direct or circumstantial evidence that supports an inference of intentional discrimination. Direct evidence requires "an admission of discriminatory intent." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). A plaintiff may also prevail under the direct method by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Circumstantial evidence can include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Alexander*, 739 F.3d at 979. The

evidence "must point directly to a discriminatory reason for the employer's action… and be directly related to the employment decision." *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 660 (7th Cir. 2013).

In his statement of claims, Dr. Singh writes that he is of the Sikh faith and an Asian-Indian man. (Filing No. 2 at 2). He is a naturalized United States citizen, and because he was born in India, he still has an accent and presents as non-Caucasian. *Id*. at 3. Dr. Singh asserts that throughout the entirety of his residency, he was treated less favorably than his white, non-Sikh co-residents. *Id*. Dr. Singh does not cite any evidence demonstrating the Defendants were aware of his religious beliefs. Dr. Singh testified that in August 2021, Dr. Volz made a comment that he should not wear his turban to work because he could take COVID to his home (Filing No. 25-5 at 95 [198:3-13]). But Dr. Volz was not part of the CCC and had no role in the Residency Program's decision to terminate his employment. Because Dr. Volz's statement is not directly related to his suspension, this statement is insufficient evidence under the direct method of proof. The Court will analyze Dr. Singh's claims under the indirect method instead.

## 2.    **Indirect Method**

Under the indirect method, courts utilize the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Courts employ this burden-shifting analysis as a means of "organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Under the familiar *McDonnell Douglas* burden-shifting method, a plaintiff must first prove (1) that he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action, and (4) other similarly situated employees who were not members of the protected class were treated more favorably. *Fane v. Locke Reynolds LLP*, 480 F.3d 534, 538 (7th

16

Cir. 2007).  If the plaintiff demonstrates these elements, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017).  "If the employer does this, then the burden shifts back to the plaintiff to produce evidence establishing a genuine dispute of fact about whether the employer's reason was a pretext for discrimination."  *Id.*

Dr. Singh argues that he can establish a *prima facie* case of discrimination.  Dr. Singh has established, and Defendants do not dispute, that Dr. Singh is a member of a protected class.  It is also undisputed that Dr. Singh suffered an adverse employment action – his non-promotion and suspension.  Dr. Singh has established the first and third elements of the *prima facie* standard for establishing discrimination on summary judgment.  The remaining issues that the parties dispute is whether Dr. Singh was meeting the Residency Program's legitimate expectations and whether employees of Community Health Network treated similarly situated individuals outside of Dr. Singh's protected class more favorably.

### a.    Legitimate Expectations

To meet the second element of a *prima facie* case, Dr. Singh must establish that he was meeting Community Health Network's legitimate expectations at the time of the adverse employment action.  *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328–29 (7th Cir. 2002).  Defendants argue that Dr. Singh was not meeting legitimate expectations for several reasons (Filing No. 25-6 at 20).  First, Dr. Singh had several concerning performance evaluations from multiple preceptors.  These concerning evaluations resulted in Dr. Singh being placed on a PIP.  Despite being placed on a PIP, Dr. Singh did not improve and failed to reach the level of clinical competency expected of a first-year resident.  Dr. Singh also caused a safety event which could have jeopardized a patient's health.

In response, Dr. Singh argues that he has submitted evidence that raises a factual question regarding whether he was meeting Defendants' legitimate expectations (Filing No. 27 at 8-9).  Dr. Singh contends that Dr. Siraj told him during a telephone call on June 13, 2022 that it was "a false patient safety event and it did not happen" and that Dr. Siraj told Dr. Shockley the same.  *Id*. at 7. Dr. Singh denies that he caused the May 2022 patient safety event.  *Id*. at 9.  Dr. Singh also contends that he can establish that he was meeting Community's legitimate performance expectations as well as can provide enough circumstantial evidence to eliminate doubt about his medical knowledge and clinical skill.  *Id*.  In particular, Dr. Singh argues,

> … Firstly as Plaintiff has pointed out in this document previously the Plaintiff got excellent evaluations by Dr. Shockley after the First rotation in the Clinic with herself serving as a direct supervisor.  Dr Shockley expressed no concerns about the Plaintiff's having any deficiency in any of the core skills.  The Second and third block the Plaintiff's performance was affected due to having a health scare of possible life threatening condition. Plaintiff did seek medical diagnosis and after that was taken care of and gave 100% effort in the rotations and did get excellent verbal feedback for the rotations in months of October 2021, November 2021 and December 2021. Instead of making any efforts to obtain evaluations from the Attending Physicians during these rotations Dr. Shockley chose to pick one single incidence during the on-call shift of Plaintiff when he could not answer one out of many questions and gave a negative feedback. No attempts were made to get any feedback from the Attendings that oversaw the Plaintiff's work for each month mentioned above.

*Id*. at 8-9.

In reply, Defendants argue persuasively, that Dr. Singh "has provided no affidavits, deposition testimony, or admissible documents supporting his claim that he performed well during these three rotations, and the Court cannot consider his inadmissible, self-serving statements regarding the same." (Filing No. 30 at 6.)  Although Dr. Singh denies in his briefing that he caused a patient safety event and that he had poor performance evaluations in each rotation, the evidence he relies on is inadmissible and therefore cannot be considered.  *See supra* Section III(A).  Dr. Singh admitted during his deposition that he was not present for the alleged conversation between

Dr. Siraj and Dr. Shockley related to the May 2022 patient safety event; so, he does not have personal knowledge of the conversation or admissible evidence detailing the conversation. Moreover, Dr. Singh has not submitted any affidavit from Dr. Siraj or Dr. Shockley. Accordingly, Dr. Singh cannot rely on the reported telephone call to support his contentions as it is inadmissible hearsay that cannot support his claims at summary judgment. There is no evidence on the record that raises a factual dispute as to the legitimate expectations prong.

### b. <u>Similarly Situated Employees</u>

Dr. Singh also fails to direct the Court to any similarly situated employee who was treated more favorably than him. A similarly situated employee is someone who is "directly comparable to the plaintiff in all material respects." *Bio v. Federal Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). When evaluating whether two employees are directly comparable, the court looks at whether the employee (1) held the same job description, (2) was subject to the same standards, (3) had the same supervisor, and (4) had comparable experience, education, and other qualifications. *Id.*

In his deposition, Dr. Singh identifies his three first-year co-residents as comparators: Dr. Jeon, Dr. Fields, and Dr. Jensen (Filing No. 25-5 at 98-102 [201:13-205-7]). He argues that his co-residents were treated more favorable because when Dr. Singh asked Dr. Clawson questions or for guidance, Dr. Clawson "would be very rude" with Dr. Singh but not with the other three co-residents. *Id*. at 99. And Dr. Clawson was dismissive of Dr. Singh but helpful to the other co-residents. *Id*. However, Dr. Singh does not submit any evidence demonstrating that his three co-residents exhibited similar performance deficiencies yet were able to stay in the Residency Program and be promoted. (*See generally* Filing No. 27; *but see* Filing No. 25-2 ¶ 27 (an affidavit from Dr. Shockley noting that no other first-year resident was placed on a PIP or caused a patient safety event during Dr. Singh's tenure).)

Because Dr. Singh cannot show that he was meeting Defendants' legitimate expectations or that a similarly situated employee was treated more favorably than he was, he cannot prevail under either theory of national origin or religious discrimination.  Accordingly, Defendants' motion for summary judgment as to Dr. Singh's Title VII discrimination claims is **granted**.

## C.    <u>Retaliation Claims</u>

Title VII also prohibits employers from retaliating against employees who oppose an unlawful practice in violation of Title VII.  *See* 42 U.S.C. § 2000e-3(a).  To survive summary judgment on a retaliation claim, a plaintiff must present sufficient evidence that:  (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse action.  *Lalvani v. Cook Cnty., Illinois*, 269 F.3d 785, 790 (7th Cir. 2001).  "The key question is whether a reasonable juror could conclude that there was a causal link between the protected activity… and the adverse action." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019) (citing *Ortiz*, 834 F.3d at 765-66).

Dr. Singh alleges that he was retaliated against after (1) he complained to Dr. Shockley about Dr. Clawson and (2) he emailed Dr. Siraj about the May 2022 patient safety event (Filing No. 25-5 at 127-28 [230:1-4, 232:11-18]).  Specifically, Dr. Singh argues that after emailing Dr. Siraj, he was placed on administrative leave by Dr. Zoppi without being given a valid written reason (Filing No. 27 at 11).

As an initial matter, Dr. Singh's retaliation claims must fail because he did not engage in a statutorily protected activity.  "An employee engages in a protected activity by either:  (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013).  Dr. Singh's

communication to Dr. Shockley about Dr. Clawson did not reference a protected category.  Dr. Singh simply stated that Dr. Clawson was rude and aggressive.  Rude mannerisms, though unkind, are not an unlawful employment practice.  Similarly, in Dr. Singh's email to Dr. Siraj, he did not reference any unlawful employment practice.  Because Dr. Singh's conduct is not statutorily protected activity, he cannot satisfy the first requirement of a retaliation claim.

We note that even if Dr. Singh participated in a statutorily protected activity when emailing Dr. Siraj, there is insufficient evidence to reasonably conclude there is a causal connection between his email and him being placed on administrative leave.  When "there are reasonable, non-suspicious explanations for the timing" of the defendant's conduct, proximity in time is not enough to support a retaliation claim.  *Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1008 (7th Cir. 2018).  Here, Defendants submitted evidence that Dr. Singh's performance issues, which predated his email to Dr. Siraj, was the reason for him being placed on administrative leave.  As previously discussed, the undisputed evidence shows that Dr. Singh was not meeting Defendants' legitimate employment expectations for the relevant time period, based upon his poor performance evaluations and him being placed on a PIP.  Accordingly, Dr. Singh's retaliation claim is **dismissed**.

**D.**    **Hostile Work Environment Claims**

To succeed on his hostile environment claim, Dr. Singh must show: (1) that he was subject to unwelcome harassment; (2) the harassment was based on his national origin; (3) the harassment was severe or pervasive so as to alter the conditions of his work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability.  *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014). ).  An objectively hostile environment is an environment which a reasonable person would find to be hostile or abusive.  *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21 (1993).  In determining whether a plaintiff meets this standard, courts consider all the circumstances, including the severity of the allegedly discriminatory conduct, its

frequency, whether it is physically threatening or a mere offensive utterance, and whether it reasonably interferes with the employee's work performance. *Id.* at 23. However, "[o]ffhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Id*. (citing *Adusumilli v. City of Chi*., 164 F.3d 353, 361-62 (7th Cir. 1998)). Not all workplace unpleasantries give rise to liability under federal civil rights laws, which do not guarantee a perfect work environment. *Vore v. Ind. Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994). Instead, to create a hostile work environment, the conduct at issue must "have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

Defendants devote a section of their summary judgment brief to discussing Dr. Singh's hostile work environment claim (*see* Filing No. 25-6 at 24-27). Defendants argue that Dr. Singh cannot show he experienced harassment based on his national origin; cannot show the alleged conduct was severe or pervasive; and cannot establish a basis for Community's liability. *See id.*

Dr. Singh's summary judgment response brief fails to mention his hostile work environment claim. The only statement Dr. Singh makes that could refer to his hostile work environment claim is that he "did not write any remarks about the insulting behavior by Dr. Clawson in the peer evaluation due to fear of retaliation…" (Filing No. 27 at 8). This is not enough.

"Where a party makes no attempt to respond to an argument concerning a claim at summary judgment, that party waives the claim." *Qualls-Holston v. Indiana Univ.*, No. 1:19-CV-04068-TWP-MG, 2021 WL 4035050, at *6 (S.D. Ind. Sept. 3, 2021); *see also Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) ("Because [plaintiff] made no attempt to respond to [defendant's] arguments at summary judgment, the district court correctly concluded that [plaintiff] waived [his

claims].").. Because Dr. Singh failed to adequately respond to Defendants' hostile work environment arguments, he waives that claim. And even on its merits, while Dr. Clawson's rude and dismissive behaviors were unprofessional and hurtful, these behaviors alone do not support a hostile work environment claim. Dr. Singh's hostile work environment claim is **dismissed**.

**E.**    **Disability Discrimination Claims**

Dr. Singh's final claim is that Defendants discriminated against him because of his disability. The ADA prohibits employers from discriminating against a qualified individual on the basis of disability in regard to discharge of employees or any other terms, conditions, and privileges of employment. *See* 42 U.S.C. § 12112(a). In order to establish a *prima facie* case of discrimination under the ADA, Dr. Singh must show: (1) that he suffers from a disability as defined by the ADA; (2) that he is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that he has suffered an adverse employment action as a result of his disability. *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005). Community does not dispute that Dr. Singh is a qualified individual with a disability under the ADA or that his suspension was an adverse employment action. As a result, the Court need only consider whether Dr. Singh can factually demonstrate that Community discriminated against him because of his disability.

Similar to proving discrimination under Title VII, an ADA plaintiff may prove disability discrimination by presenting direct evidence of discrimination, or he may proceed using the *McDonnell Douglas* burden-shifting method. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). Regardless of what method is used, put simply, Dr. Singh must demonstrate that but-for his disability, he would not have been terminated. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).

Community argues they had legitimate, non-discriminatory reasons for terminating Dr. Singh's employment – his long line of deficiencies which caused him to fall below Community's legitimate expectations – and that Dr. Singh has not shown their reasons were pretextual. As discussed above, when looking at the designated evidence, and Dr. Singh's performance throughout the duration of his residency, no reasonable factfinder can conclude that Dr. Singh was meeting Community's legitimate expectations. The Court **grants** summary judgment in favor of Defendants on Dr. Singh's claim for discrimination in violation of the ADA.

## IV.    CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment (Filing No. 25) is **GRANTED**. Dr. Singh's claims are **dismissed**, and final judgment will issue under separate order.

**SO ORDERED.**

Date: 12/23/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Gursharan Singh
76 Fernleaf Drive
New Whiteland, Indiana  46184

Charles Ellis Bush, II
ICE MILLER LLP
charles.bush@icemiller.com

Phillip J. Jones
ICE MILLER LLP
Phillip.Jones@icemiller.com